## ALCOHOLIC BEVERAGES

**BOARDS OF LIQUOR LICENSE COMMISSIONERS – LICENSE FEES – HOW TO APPLY THE FEE ALLOCATION REQUIREMENTS FOR THE HARFORD COUNTY LIQUOR CONTROL BOARD CODIFIED IN § 22-208(A) OF THE ALCOHOLIC BEVERAGES AND CANNABIS ARTICLE**

September 21, 2023

*W. Michael Crabbs*
*General Manager, Liquor Control Board for Harford County*

You have asked for our interpretation of § 22-208(a) of the Alcoholic Beverages and Cannabis Article, which governs the disposition of fees that the Liquor Control Board for Harford County (the "Board") receives "from the issuance of licenses." The provision states that, after deducting "a proportionate share of the expenses to administer and enforce" the alcoholic beverages laws in Harford County and then withholding certain amounts for a reserve account, "the Board shall pay the net proceeds of fees received from the issuance of licenses" to specified local governments in Harford County. Md. Code Ann., Alc. Bev. & Cannabis ("AB") § 22-208(a); *see also id.* (b) (governing the reserve account). You have asked whether "fees received from the issuance of licenses" means only the license fees themselves or whether they also include application and transfer fees that the Board collects as part of the licensing process, as well as late fees, fines collected from licensees for violations of the liquor laws, and refunds returned to the Board from various sources. As we explain below, our opinion is that AB § 22-208(a) applies only to the license fees themselves.

## I
## Background

The General Assembly has enacted "a comprehensive scheme for the regulation, control and distribution of alcoholic beverages" in Maryland. *Coalition for Open Doors v. Annapolis Lodge No. 622, Benevolent & Protective Order of Elks*, 333 Md. 359, 371 (1994). "[U]nlike other regulated areas," however, "there is not a single agency that administers the alcoholic beverages law, but rather numerous local boards that are charged with its enforcement." *Board of Liquor License Comm'rs v. Hollywood Prods., Inc.*, 344 Md. 2, 13 (1996). In Harford County, that task falls to the Board, which "issues all alcoholic beverage licenses in [the] County, transfers licenses from one person or entity to

another, from one location to another, or one license class to another; issues per diem (one day) licenses for non-profit organizations[;] and renews alcoholic beverage licenses on an annual basis." *Functions & Regulations*, Harford County Liquor Control Board, http://www.hclcb.org/functions-regulations (last visited Sept. 12, 2023).

The Board is a creature of statute.[1]  Title 22 of the Alcoholic Beverages and Cannabis Article establishes the Board and sets forth, among other things, the types of licenses it may issue, the fees for each license, and how the Board is to dispose of "fees received from the issuance of licenses."  AB § 22-208(a).

Section 22-208—the statute at issue here—provides that the Board shall, "after deduction of a proportionate share of the expenses to administer and enforce this title, including the salaries of the members and employees of the Board":

> pay the net proceeds of fees received from the issuance of licenses:
>
> (1) outside of Aberdeen, Bel Air, and Havre de Grace, to the Treasurer to be credited to the general fund of the county; and
>
> (2) in Aberdeen, Bel Air, and Havre de Grace, to the treasurers of the respective municipalities to pay the interest and redeem the principal of any bonded indebtedness of the municipality.

---

[1] Despite its name, the Board is officially a board of license commissioners, not a liquor control board. *See* AB § 22-201 (establishing a board of license commissioners); AB § 22-301 (providing that "[t]here is no liquor control board . . . in [Harford] [C]ounty"). "Generally speaking, boards of license commissioners located in each county license and regulate retail sellers of alcoholic beverages within that county," 99 *Opinions of the Attorney General* 31, 32 (2014), whereas liquor control boards "regulate[] the sale and distribution of alcohol through the operation of liquor dispensaries," *id.* at 33.  Harford County once had both a liquor control board and a board of license commissioners; "though charged with separate and distinct duties," each "consisted of the same membership."  2016 Md. Laws, ch. 41 (Revisor's Note to AB § 22-301).  But the County's liquor dispensary system—the domain of the liquor control board—ceased to exist in 1981. *See id.*; *see also* 1979 Md. Laws, ch. 742 (abolishing the county's liquor dispensary system, as of September 1, 1981, subject to a voter referendum); Edna Goldberg, *Private Liquor Sales to Resume in Harford After 42-Year Absence*, Balt. Sun, July 20, 1981, at C1 (noting voters' approval of the referendum).

AB § 22-208(a). The statute also allows some of the money "distributed to the Board from license fees," before being distributed to the appropriate local jurisdictions, to go into a "special, nonlapsing" Reserve Account, which, in addition to that money from license fees, consists of fines collected and recognizances forfeited for violations of the liquor laws, "interest or other income earned from the investment of any portion of the Reserve Account," and "any other money from any other source accepted for the benefit of the Reserve Account." AB § 22-208(b).[2]

The Board collects various fees as part of the licensing process. Each applicant pays a license fee, which varies by license type.[3] An applicant for an annual license must, in addition to the license fee, pay a $600 application fee. Harford County Liquor Control Board, *How to Apply for a New or Transfer Annual Alcoholic Beverage License in Harford County, Maryland* 6 (rev. June 2023). Applicants seeking to transfer a license from another licensee must pay a $20 license change fee, and applicants who want a hard copy of the Board's rules and regulations must pay an additional $10 fee. *Id.* Applicants for a per diem license must, in addition to the license fee, pay a $1 mailing fee and, if applicable, a $30 outside event fee and a $50 late fee. Harford County Liquor Control Board, *(Class C) Per Diem Alcoholic Beverage License Application, Non-Profit Organizations* 1 (rev. Apr. 2020).[4] The Board also receives income from fines imposed and recognizances forfeited for violations of the alcoholic beverages laws, *see* AB § 22-2606, and "refunds that are returned to the Board from various sources," Memorandum from Amy K. Finneran, Legal Counsel, to

---

[2] The purpose of the Reserve Account "is to ensure that issuance and renewal of licenses, licensing enforcement, and other services that the Board provides will continue to be met in the face of unanticipated financial events or circumstances." AB § 22-208(b)(3). The Reserve Account may not exceed $100,000 at any time, *id.* (b)(10), and, each year, "the amount payable into the Reserve Account may not be more than 20% of the aggregate net proceeds received by the Board," *id.* (b)(8).

[3] License fees are set by statute and, in Harford County, range in amount from $15 for a fundraiser wine permit or a Class C per diem license to sell beer and/or wine, AB §§ 4-1209(e), 22-1309.1(a), to $10,000 for an annual stadium beer, wine, and liquor license, AB § 22-1006(g).

[4] Many of these fees, including the $600 application fee, do not appear to be expressly authorized by statute. We have not been asked to examine whether the Board has implied authority to charge these types of fees and, thus, we do not address that question here. The $20 transfer fee is, however, expressly authorized by AB § 22-1705.

Liquor Control Board for Harford County 1 (May 16, 2023) ("Finneran Memorandum").

The Board has interpreted AB § 22-208(a)—which requires the Board to pay certain local governments "the net proceeds of fees received from the issuance of licenses"—to apply only to the balance of license fees themselves. Finneran Memorandum at 1. The Board does not transmit the balance of any other fees it collects in the licensing process, nor does it share any portion of the fines, recognizances, or other income it receives. The Board now seeks our interpretation of AB § 22-208(a).

## II
## Analysis

To determine the scope of the phrase "fees received from the issuance of licenses," we must interpret AB § 22-208 and try to divine the General Assembly's intent. *E.g.*, *Lewis v. State*, 348 Md. 648, 653 (1998). We do this by, among other things, examining the text of the statute, searching the legislative history, and considering how the statute has changed over time. *E.g.*, *Nationstar Mortg. LLC v. Kemp*, 476 Md. 149, 169-70 (2021) (recognizing that statutory interpretation begins "with an examination of the text" and may include a review of "the legislative history . . . to confirm conclusions drawn from the text or to resolve ambiguities"); *Spiegel v. Board of Educ.*, 480 Md. 631, 643 (2022) (considering "the evolution of the statutes" at issue).

## A.   *Text of the Statute*

"[O]ur analysis begins with the normal, plain meaning of the language of the statute." *Wheeling v. Selene Fin. LP*, 473 Md. 356, 376 (2021). As already noted, AB § 22-208(a) requires the Board to pay certain local governments "the net proceeds of fees received from the issuance of licenses." The use of the word "fees" makes clear that the Board need not turn over any share of the fines, recognizances, refunds, or other income that does not come from fees. *See, e.g.*, *State v. Glass*, 386 Md. 401, 410 (2005) (recognizing that one interpreting a statute "may neither add to, nor delete, statutory language that is plain and unambiguous language in order to reflect an intent not evidenced in that language" (internal quotation marks omitted)). But that leaves the question of which fees qualify as those "received from the issuance of licenses."

On that question, however, the text of § 22-208(a) is ambiguous. To "issue" means "to put forth or distribute usually officially"[5] or "to produce or provide something official."[6] "[T]he issuance of licenses," then, ordinarily means the process of officially providing licenses. One might reasonably conclude that this process entails only the actual exchange of a license for a license fee, in which case the "fees received from the issuance of licenses" would mean license fees only. But one might also reasonably conclude that the process of providing a license encompasses the entire application procedure. As we understand it, the Board will not issue a license unless it receives an application, and it will not review an application—a prerequisite to issuing a license—unless the applicant pays all attendant fees, including, for instance, the $600 processing fee for an annual license. Thus, one might reasonably conclude that *all* fees that the Board charges in the license application process are "fees received" by the Board "from the issuance of licenses." Because there are "two or more reasonable alternative interpretations," the statutory phrase is ambiguous, *Deville v. State*, 383 Md. 217, 223 (2004), and we "must resolve the ambiguity by searching for legislative intent in other indicia," *Wheeling*, 473 Md. at 377 (quoting *Lockshin v. Semsker*, 412 Md. 257, 276 (2010)).

## B.   Legislative History

One place we often look for legislative intent is the legislative history. But, in this case, it offers no insight. The Legislature enacted AB § 22-208(a) in 2016 as part of the recodification of former Article 2B into the Alcoholic Beverages Article. *See* 2016 Md. Laws, ch. 41, § 2, at 1751-53.[7] "As with all other code revision bills, this [was] a non-substantive revision." *Hearing on S.B. 724 Before the Senate Education, Health, and Environmental Affairs Comm.*, 2016 Leg., Reg. Sess., at 37:55 (Feb. 26, 2016) (testimony of Susan Russell, Manager of Code Revision Projects, Dep't of Leg. Servs.). "Code revision is a periodic process by which statutory law is re-organized and restated with the goal of making it more accessible and understandable," and it generally does not "modify the law." *Smith v. Wakefield, LP*, 462 Md. 713, 726 (2019). Not surprisingly, then, the legislative history for the code

---

[5] *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/issue (last visited Sept. 12, 2023).

[6] *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/issue (last visited Sept. 12, 2023).

[7] Lawmakers renamed the article "Alcoholic Beverages and Cannabis" this year. 2023 Md. Laws, ch. 254, 255, § 6.

revision legislation does not give any indication that lawmakers discussed the language that became AB § 22-208 or its meaning. We thus look beyond the legislative history of that legislation to earlier iterations of the statutory language that now appears in AB § 22-208(a). *See, e.g.*, *Kimble v. State*, 242 Md. App. 73, 81-86 (2019) (interpreting a statute by, among other things, consulting earlier versions of the statute); *see also Murrell v. Mayor & City Council of Baltimore*, 376 Md. 170, 186 (2003) ("The historical background of a statute often casts light on the meaning or scope of that statute.").

## C.   *Historical Evolution of the Statute*

Much of the substance of what is now AB § 22-208 dates back to 1937. *See* 1937 Md. Laws, ch. 272 (enacting § 421N of Article 13 of the Code of Public Local Laws). At that time, the County Commissioners of Harford County issued licenses. *See id.* (enacting § 421B of Article 13 of the Code of Public Local Laws). The legislation authorized two kinds of licenses for Harford County, *id.* (enacting § 421E of Article 13 of the Code of Public Local Laws), specified the fee amount for each type of license, *id.* (enacting § 421F of Article 13 of the Code of Public Local Laws), and outlined how the Commissioners were to distribute the money they received:

> The net proceeds of all *funds received* by the County Commissioners *from the sale of licenses* under the provisions of this Act issued in Harford County, outside of the corporate limits of the municipalities of Aberdeen, Bel Air and Havre de Grace, shall be paid to the Treasurer of Harford County and credited to the "Contingent Fund" of said County Commissioners.

> The net proceeds of the *funds derived from the sale of licenses* issued to licensees within the corporate limits of the municipalities of Aberdeen, Bel Air and Havre de Grace, after the deduction of a proportionate part of the expenses incident to the proper administration and enforcement of this Act, shall be paid by said Commissioners to the Treasurers of said respective towns, to be applied first to the payment of the interest due on their respective bonded indebtednesses, and second to the

redemption of the principal of said bonded
indebtednesses.

*Id.* (enacting § 421N of Article 13 of the Code of Public Local
Laws) (emphasis added).[8]

The 1937 statute's use of the phrase "*sale* of licenses"
suggests that the General Assembly was concerned only with the
disposition of license fees themselves, not any other fees that might
have been collected as part of the licensing process.[9]  Although we
cannot tell if there were in fact any other fees collected as part of
the licensing process at the time, the language suggests that, if so,
they would not have been covered.  After all, "sale" means "the act
of selling,"[10] and "sell," in turn, means "to exchange (something)
for money"[11] or "to give up (property) to another for something of
value (such as money)."[12]   Indeed, the term "sale price" is
commonly understood to mean "the price that is paid by the buyer
at the time when something is sold."[13]   Thus, while the phrase
"*issuance* of licenses" might be read to include the entire licensing
process from application to receipt of a license, we think the phrase

---

[8] In 1933, the General Assembly had enacted legislation with similar
language about the disposition of "funds derived from the sale of . . .
licenses."  1933 Md. Laws, ch. 393 (enacting § 421M of Article 13 of
the Code of Public Local Laws).  But that law allowed the Mayor and
Council of Havre de Grace to issue licenses in that municipality.  *Id.*
(enacting § 421B of Article 13 of the Code of Public Local Laws).  We
find the 1937 law more significant for our purposes because it was the
first to authorize a single entity (at that time the County Commission) to
issue all licenses in the County and to outline the disposition of funds
derived from the sale of licenses in each of the County's municipalities,
not just Havre de Grace.

[9] The legislation enacted in 1933, when the County Commissioners
issued all licenses except those in Havre de Grace, similarly used the
phrase "sale of licenses." *See* 1933 Md. Laws, ch. 393 (enacting § 421M
of Article 13 of the Code of Public Local Laws, which specified the
disposition of "funds derived from *the sale of . . . licenses*" (emphasis
added)).

[10] *Merriam-Webster Dictionary*, https://www.merriam-webster.com/
dictionary/sale (last visited Sept. 12, 2023).

[11] *The Britannica Dictionary*, https://www.britannica.com/dictionary/
sell (last visited Sept. 12, 2023).

[12] *Merriam-Webster Dictionary*, https://www.merriam-webster.com/
dictionary/sell (last visited Sept. 12, 2023).

[13] *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/
english/sale-price (last visited Sept. 12, 2023).

"*sale* of licenses" suggests a narrower focus, limited to the actual exchange of a license for the payment of a license fee.

To be sure, the use of the phrase "funds derived from the sale of . . . licenses" in these versions of the statute still leaves some ambiguity. If the Legislature intended to mandate the disposition of only the license fees themselves, lawmakers could have eliminated any ambiguity by simply using the phrase "license fees." Unfortunately, there is no legislative history that we may consult to clarify the General Assembly's intent. *See, e.g.*, *Guide to Maryland Legislative History Research*, Thurgood Marshall State Law Library, https://mdcourts.gov/lawlib/research/research-guides/guide-to-md-legislative-history-research (last visited Sept. 12, 2023) (noting that bill files containing legislative history for each House and Senate bill were not routinely kept until 1976).

But later clues from the statute's evolution confirm our reading of the statute. In the years following 1937, the General Assembly made slight changes to the statutory language and where it appeared. In 1939, the Legislature established a liquor control board for Harford County and gave it the power to issue alcoholic beverage licenses. 1939 Md. Laws, ch. 734. Two years later, lawmakers established that the liquor control board would serve also as a board of license commissioners, and the General Assembly amended the public local law regarding the distribution of funds from the sale of licenses. 1941 Md. Laws, ch. 260 (establishing the board of license commissioners), ch. 500 (amending § 421N of Article 13 of the Code of Public Local Laws). The Legislature replaced references to "County Commissioners" with "the Board" but otherwise retained the substance of the earlier version, including the phrases "funds received . . . from the sale of licenses" and "funds derived from the sale of licenses." *Id.*

The key change for our purposes, however, was that lawmakers, as part of the 1941 legislation, added a new paragraph that referred to the funds received or derived from the "sale" of licenses as "license fees":

> All expenses incident to the proper administration and enforcement of this Act, including one-half the salaries of the members of said Board, and the proper proportion of the salaries of any employees of said Board, whose duties include the handling of said licenses, including the salaries of officers, inspectors, etc., shall be deducted proportionately

> *from the shares of the license fees payable as above set forth* to the County Commissioners and the governing bodies of the three municipalities.

*Id.* (emphasis added).  By authorizing the Board to deduct expenses "proportionately from the share of the *license fees* payable as set forth above," the Legislature was referring back to "funds received . . . from the sale of licenses" and "funds derived from the sale of licenses"—suggesting that these latter phrases were synonymous with "license fees."  This bolsters our view that the General Assembly intended to legislate the disposition of license fees only, not any other fees that might be assessed as part of the licensing process.

The Legislature's recodification of alcoholic beverages laws in 1947 lends further support.  That year, lawmakers revised Article 2B of the Maryland Code, recodifying the alcoholic beverages laws and incorporating relevant public local laws, including the provision governing the distribution of "funds received" and "derived from the sale of licenses" in Harford County.  1947 Md. Laws, ch. 501 (enacting Art. 2B, § 56).  Lawmakers imported the language of that provision nearly verbatim into a section of the Code devoted to the disposition of license fees.  *See* Md. Ann. Code, Art. 2B, § 51(m) (1939 & 1947 Supp.).  The opening paragraph of that section set forth the default approach:

> Except as otherwise provided in this section, the Clerk shall forthwith remit all *license fees* collected by him, less a fee of One Dollar ($1.00) for the issuance of each license, to the Board of County Commissioners for the county, or to the Mayor and City Council of Baltimore, as the case may be. . . .

*Id.* (a).  This language suggests that the Legislature intended the statute to govern only the disposition of license fees themselves, not any other fees that may have been collected in the licensing process.

In the subsections that followed, lawmakers specified when the practice in specific local jurisdictions diverged from the default practice.  In Harford County, the Legislature required, as it did before, that "[t]he net proceeds of all funds received by the Board from the sale of licenses . . . issued . . . outside of the corporate limits of the municipalities" "be paid to the Treasurer of Harford County."  *Id.* (m).  "The net proceeds of the funds derived from the

sale of licenses within the corporate limits of the municipalities," "after the deduction of a proportionate part of the [Board's] expenses," were to be "paid . . . to the Treasurers of" the municipalities. *Id.* And "[a]ll expenses incident to the proper administration and enforcement" of the alcoholic beverages laws were to "be deducted proportionately from the shares of the license fees payable as above set forth to the County Commissioners and the governing bodies of the three municipalities." *Id.* Reading this language in conjunction with the opening paragraph of the section, which speaks only of "license fees," reinforces our instinct that, by referring to "funds received" and "derived from the sale of licenses," the General Assembly meant "license fees."

Adding to our confidence is the heading that the General Assembly adopted for this statute: "Disposition of License Fees." 1947 Md. Laws, ch. 501 (enacting Art. 2B, § 56); *see also* Md. Ann. Code, Art. 2B, § 51 (1939 & 1947 Supp.). To be sure, "captions are often the words of the publisher of the Code, not of the legislature," in which case they are of no help for "purposes of statutory construction." *Morris v. Prince George's County*, 319 Md. 597, 607 n.4 (1990); *see also* Md. Code Ann., Gen. Provis. ("GP") § 1-208 (providing generally that "the caption or catchline of a section . . . that is printed in bold . . . is intended as a mere catchword to indicate the contents of the section" and "may not be considered as a title of the section"). But on the "rare occasions" that "captions are written by the General Assembly," Maryland's appellate courts have sometimes "look[ed] to the captions to assist [their] search for the legislature's intent." *Bartenfelder v. Bartenfelder*, 248 Md. App. 213, 239 (2020); *see also Westfield Ins. Co. v. Gilliam*, 477 Md. 346, 373 n.29 (2022) (acknowledging that, in an earlier decision, the Maryland Supreme Court relied on a caption to interpret a statute because the "heading was created by the Legislature itself and was not, as is often the case, simply a caption added by a legal publisher"); *Morris*, 319 Md. at 607 n.4 (providing that, while courts "do not ordinarily refer to [captions] for purposes of statutory construction," "[i]t is otherwise . . . when the General Assembly has itself included the caption in the enacted bill"); *Smelser v. Criterion Ins. Co.*, 293 Md. 384, 386 n.2, 390 (1982) (stating that an earlier version of GP § 1-208, providing generally that section captions "are intended as mere catchwords," was "not applicable" where "the captions [were] found in the original enactment of" the statute that the Court was interpreting (quoting Md. Ann. Code, Art. 1, § 18 (1981 Repl. Vol.))); *State Farm Mut. Auto. Ins. Co. v. Insurance Comm'r*, 283 Md. 663, 675 & n.4 (1978) (considering, in the interpretation of a statute, a section

heading that was "not merely a caption inserted by the codifier" but, rather, in the act passed by the General Assembly).[14]

---

[14] We acknowledge that the Maryland Supreme Court has also said in a footnote that captions "are not evidence of legislative intent," "[e]ven if the General Assembly . . . adopted those headings." *Select Portfolio Servicing, Inc. v. Saddlebrook W. Util. Co.*, 455 Md. 313, 336 n.28 (2017) (citing GP § 1-208); *accord Rohrer v. Humane Soc'y of Washington County*, 454 Md. 1, 24 n.15 (2017) (citing GP § 1-208 for the proposition that "captions and catchlines are not regarded as evidence of legislative intent"). But we think it appropriate to consider the section heading here, for several reasons. First, notwithstanding the language in *Select Portfolio* and *Rohrer*, and notwithstanding GP § 1-208 and its predecessors, the Court has, on several occasions, considered a section heading when interpreting a statute. *See Morris*, 319 Md. at 607 n.4; *Smelser*, 293 Md. at 386 n.2, 390; *State Farm Mut. Auto. Ins. Co.*, 283 Md. at 675 & n.4. Indeed, in a case decided more recently than *Select Portfolio* and *Rohrer*, the Court has reaffirmed the idea that a caption enacted by the Legislature may be relevant to the interpretation of a statute. *See Westfield Ins. Co.*, 477 Md. at 373 n.29 (explaining, without disavowing, the Court's earlier reliance on a caption to interpret a statute). Second, the Court has more recently indicated that it is typically captions that are "added by a legal publishing company" after enactment that have *no* relevance to "the meaning of a statutory provision." *SVF Riva Annapolis LLC v. Gilroy*, 459 Md. 632, 646 (2018) ("When divining the meaning of a statutory provision, we do not allow such *unsanctioned additions* to impact our analysis." (emphasis added)); *see also Johnson v. State*, 467 Md. 362, 373 n.2 (2020) (asserting that "captions and catchlines are not evidence of legislative intent" "*[b]ecause of [the] fact*" that "[c]aptions and catchlines are generally not part of the legislation passed by the General Assembly" but, rather, "are added by legal publishers after a bill becomes law" (emphasis added)). Third, in *Select Portfolio*, where the Court said that even headings adopted by the General Assembly are not evidence of legislative intent, the statute at issue did not actually have captions enacted by the Legislature but, instead, "headings added by legal publishers," 455 Md. at 336 n.28—meaning that the Court's statement was not necessary to resolve the case and, as such, "not controlling," *see, e.g.*, *Plank v. Cherneski*, 469 Md. 548, 594-96 (2020). Finally, in *Rohrer*, the legislation at issue contained uncodified language expressly providing that "catchlines, captions, and Revisor's Notes contained in" the legislation were "not law and [could] not be considered to have been enacted as a part of" the legislation. 2002 Md. Laws, ch. 26, § 14; *see also Rohrer*, 454 Md. at 24 n.15 (citing that session law); *see also Williams v. Peninsula Reg'l Med. Cent.*, 440 Md. 573, 584 (2014) ("[i]gnoring . . . section captions" when the underlying act contained language expressly stating that catchlines were not part of the law). Although the 2016 bill revising the Alcoholic Beverages Article included similar language, *see* 2016 Md. Laws, ch. 41, § 7, the 1947 session law at issue here contained no such limitation, *see* 1947 Md. Laws, ch. 501.

Here, the General Assembly apparently included the heading "Disposition of License Fees" in the act itself, *see* 1947 Md. Laws, ch. 501, § 1 (enacting Art. 2B, § 56), supporting the view that lawmakers intended to govern the disbursement of only those specific fees and not of any others. Of course, this heading does not, standing alone, establish the meaning of the statute. "[A] caption to a section of the law, particularly one inserted by the Legislature during a nonsubstantive code revision, should never be the *determining* factor in deciphering legislative intent." *Sanchez v. Potomac Abatement, Inc.*, 198 Md. App. 436, 450 (2011) (emphasis added), *aff'd*, 424 Md. 701 (2012). But even assuming that the 1947 enactment was a nonsubstantive code revision, the 1947 enactment was not the first time that the Legislature indicated that this statutory provision applied only to license fees. In 1933, when the General Assembly first enacted Article 2B, lawmakers adopted the caption "License Fees—Computation and Disposition" for the statutory provision that, in 1947, was amended to include the language specific to Harford County. 1933 Md. Laws, Spec. Sess., ch. 2 (enacting Art. 2B, § 14). And, read alongside the text of the statutory provision itself, we think these headings—even though they are not controlling on their own—are at least another indication that the Legislature intended the statute to control the disposition of license fees only, not of any other types of fees.

Following the 1947 codification, the relevant statutory language moved to different locations in the Code[15] but otherwise remained essentially unchanged until the 2016 code revision when the General Assembly adopted the language that now appears in AB § 22-208. *Compare* Md. Ann. Code, Art. 2B, § 10-204(n) (2011 Repl. Vol.), *with* Md. Ann. Code, Art. 2B, § 51(m) (1939 & 1947 Supp.). Lawmakers made clear that the 2016 legislation

---

[15] The language appeared in § 60 of Article 2B, *see* Md. Ann. Code, Art. 2B, § 60 (1951), then in § 63, *see* Md. Ann. Code, Art. 2B, § 63 (1957), and then in § 10-204, *see* Md. Ann. Code, Art. 2B, § 10-204 (1994 Repl. Vol.). The opening paragraph of the provision also changed to permit, "[e]xcept as otherwise provided in [the] section," the clerk in each local jurisdiction to retain $2 (as opposed to only $1), *see* Md. Ann. Code, Art. 2B, § 63(a) (1981 Repl. Vol), and later "a commission of 5 percent," Md. Ann. Code, Art. 2B, § 63(a) (1987 Repl. Vol.). Lawmakers then amended the default language to require "the local collecting agent" to "remit all license fees" to "the board of county commissioners or county fiscal agent for the county, or to the Mayor and City Council of Baltimore, as the case may be." Md. Ann. Code, Art. 2B, § 10-204(a) (1994 Repl. Vol.). That default language now appears in AB § 4-112. *See* 2016 Md. Laws, ch. 41, § 2, at 270-71 (Revisor's Note to AB § 4-112).

was to "be construed as a nonsubstantive revision," not a "change in the law." 2016 Md. Laws, ch. 41, § 6. In other words, the Legislature intended "fees received from the issuance of licenses," AB § 22-208(a), to mean the same thing as "funds received" and "derived from the sale of licenses," in the earlier version of the Code, Md. Ann. Code, Art. 2B, § 10-204(n) (2011 Repl. Vol.). And, for the reasons stated above, we believe that these phrases are simply another way of saying "license fees."

### III
### Conclusion

Having examined the plain language of AB § 22-208, consulted its legislative history, and traced the evolution of the statutory language since 1937, we conclude that the phrase "fees received from the issuance of licenses" refers only to license fees, not to any other types of fees collected by the Board, nor any other income the Board receives.

Anthony G. Brown
Attorney General of Maryland

Rachel A. Simmonsen
Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions and Advice